OK, the next case is number 2010-5140, Chapman against the United States. Mr. Tony. Thank you, Your Honor. It's a pleasure to be here for the first time. I hope it's not the last time. I wanted to start, well, to invite questions from the members of the court from the outset. I wanted to start with the first question, the first claim, which is whether Mr. Chapman, whether the Corrections Board erroneously concluded that Mr. Chapman did not affect his ability to lose weight or maintain his body fat and body weight. As we pointed out to the court in the briefing, he was first, he went to a Navy physician in 1995 who assigned a diagnosis of obesity with compulsive overeating. That same physician recommended that he attend a rehabilitation program at the Naval, an addictions program at the Naval Hospital in Jacksonville. OK, Mr. Tony, you understand that we cannot review the factual determinations, so do take us directly to the questions of law that you wish us to respond to. The first question of law I wish you to respond to is the claim, there's a claim by the government that if he had been diagnosed with this condition that he would have been administratively separated anyway. In this instance, he was separated for obesity. So the point there I wanted to make by introducing that is that because his weight did not affect his performance of duties at any time, he would not have been eligible for administrative separation under the provisions concerning an eating disorder. So that leads into the second claim, which is whether the Coast Guard obtained a required certification for it. Well, before you go there, doesn't that require us to conclude that he was in fact diagnosed with an eating disorder? Because the section you refer to, the Article 12 section, that says they can only remove someone for obesity with a certification, but that only applies to people with eating disorders. And I guess what I'm wondering is, I can't get behind the factual questions, like Judge Newman suggested in the beginning, and they concluded that he didn't have an eating disorder. And I'm wondering, doesn't it require me to reach a different factual conclusion on that issue, just in order to be able to even say they didn't properly certify him? No, even in the case of if the court agrees with the trial court got it correct, and they said that, well, we agree with the Coast Guard that obesity with compulsive overeating is not a medical discharge, or it's not a physiological condition. Well, our position is it certainly is a psychiatric or psychological condition. We've made the argument that, by definition, compulsion is something that a person just doesn't have the will to stop. So that was provided by the Navy physician. So returning to the separation provision, the required certification, am I missing your question? Maybe, or maybe I'm not understanding it. But the certification provision, I guess it's the Article 12b provision, that only applies to people who have been found to have an eating disorder. No, Your Honor, only for the purpose of separation under provision for eating disorder. There are two separate provisions. One is the separation, whether they could have separated him for an eating disorder. Well, it's irrelevant, because they contend that he did not have an eating disorder. And even if they had determined that he had an eating disorder, they could not have separated him under that provision, because it did not impact his performance of duties. So turning to the provision that they did separate him under, which was under the Personnel Manual and Administrative Separation for Obesity. Now, the certification requirement there states, and this is the only due process that Mr. Chapman had, and this is a Coast Guardsman with over 19 years of service whose retirement has been approved. He's not entitled to a hearing. This is the only due process that exists for him, which is this certification. It states, he could be separated for obesity, provided a medical officer certifies a proximate cause of the obesity is excessive voluntary intake of food and drink, common, rather than organic or other similar causes, apparently beyond the member's control. First of all, he was removed for failure to comply with standards, right? Correct. But if he had a medical disorder, there would have been an exception. That would have prevented his separation under this provision. That's right. And a physician held, or certified, wrote that he did not have a medical condition. That was for, when it was for a different purpose, and what it stated, it didn't state that he doesn't have a medical condition. The question there was, is there an underlying medical condition for a member's excess weight? No. Right, but the difference between that requirement, that was on what's called a command referral form. It went to a contract physician, a civilian, not a Coast Guard physician. And the purpose of that determination was to assess, one, does he have a medical problem that's causing his excess weight? If, in fact, he does, we need to treat it. Two, is it safe for him to engage in the weight loss program? They both check no. I do not know, and Mr. Chapman does not know, your honors, whether that civilian had his entire medical record. For one, which would have reflected his diagnosis of obesity with compulsive overeating, and his going through the rehabilitation program. How do you expect us to reverse on the basis of things that you said you don't know? Well, where it can be reversed on is the fact that this certification is absolutely required. It's not ambiguous. It's very clear. It states a medical officer. Medical officer is a member of the Coast Guard. It could be a Commissioned Corps, Public Health Service person, or a Department of Defense official. Why they do not allow a civilian to make that determination is because the civilian does not understand the Coast Guard regulations. At no time when these three medical certifications were made for him to engage in the weight loss program did that physician understand that he might be separated from the Coast Guard. That was not the purpose for which he conducted those. So the certification for separation, that's his due process. That's it. That's to ensure that this is not going to be unjust or erroneous or otherwise unlawful. It doesn't give them an option to obtain the certification. It is mandatory. The BCMR and the district court construed these three command referral forms which pertain to his ability to participate in the weight loss program as sufficient to meet that. Well, that's contrary to the plain language of the regulation. And the difference is here, again, it's much. Why is it contrary to the plain language of the regulation? Because it requires certification by a medical officer. And the scope of the certification is both different and broader than just. But what, is it not a medical officer who filled out these three forms? No, he was a civilian, a contract physician. A contracted by? The Coast Guard. It was somebody in the local community that they referred my client to. And you think that this says, provided a medical officer certifies approximate cause of obesity, does the Coast Guard have a lot of medical officers? I don't know. They have sufficient. They have also public health service commission corps officers who work for them as well. Whether they do or not, that's what the regulation requires. And there's a purpose for that requirement. And that is because, as I mentioned, the medical officer is going to understand what this is about. And assuredly, the medical officer is going to have his complete record before him when he makes his review. So that being the case, the medical officer is also looking at the standard, which says organic or other similar causes apparently beyond the member's control. That's quite explicit. And that was not addressed in the command and referral forms. So the medical officer is going to look at that. He's going to see his diagnosis in 1995. He's going to see his treatment in 1998. He's going to see his continued struggles with his weight over the years and say, yes, there is a problem here. But I think in terms of this court and also the trial court, the issue in where this is a reversible decision is that there certainly is a reasonable probability of harm to my client by the Coast Guard's failure to comply with this provision of its own regulation, which of course has the force and effect of statute. OK, I have a silly question that maybe I can make a difference. JA 189 is the last command medical referral form on Mr. Chapman. And this is one of the ones where they answered the question, is there any underlying medical condition for the member's excessive weight? And it's checked no. I understood this to be signed by someone in his chain of command. In fact, there's signatures as commanding officer's signature. He refers that what the instructions provide is that the commanding officer or someone in the chain of command will prepare the form. And then it's provided to the medical personnel for completion. So the signature at the bottom is not. In this case, it is actually a lieutenant commander in the United States Naval Reserve. It says it right there. Right. So it is a medical officer. It is a doctor who happens to be an officer. In that case, it is correct. In that case, it is. So nonetheless, to go back to the point that the Coast Guard promulgates its own regulation and it's lawful. And it has to comply with them. And the questions that are being asked here, one for participation in weight loss, the other for separation, are different questions. The latter question being much broader in scope. We're trying to protect this individual. Certainly when you have somebody who's served honorably for over 19 years, it becomes quite acute. The importance of it becomes quite acute. But they have these standards because they're related to the performance of the function of the service, right? And you didn't meet them. They're not concerned with performance. And you're saying that the certification requirements weren't met. But I'm quoting, the court finds that the essential safeguards of the certification statement were preserved through the issuance of the three command referral forms. And the court got it wrong, in my opinion, because it didn't take into consideration the scope of the question being asked on medical certification, which is organic or other similar causes, apparently beyond the member's control. Those facts questions? I believe it's a legal question, in the sense, was that complied with? I mean, there's no dispute that they didn't contain the certification. So I think the question is, was it harmful error? All right, let's hear from the government. Thank you. Thank you. Mr. Woodrow. May it please the court. Substantial evidence supports the board's decision on holding Mr. Chapman's discharge for failing to meet the Coast Guard's weight and body fat standards. First, the board correctly concluded that Mr. Chapman was not suffering from a medical condition that affected his ability to lose weight and body fat. Second, the board correctly concluded that the command referral forms met the certification requirement for discharge due to a BCD set forth in Article 12b12 of the personnel manual. And finally, the board correctly The discharge was implemented before the completion of the period that was given Mr. Chapman. That is correct, Your Honor. And the discharge was based upon the commanding officer's conclusion that Mr. Chapman had failed to make reasonable and consistent progress towards his weight loss goals. And he was given a deadline, and you didn't wait to see if the deadline would come into effect or not? Well, Your Honor, the Coast Guard's regulations permit a discharge if a member is not making reasonable and consistent progress. In other words, the regulations do not require the Coast Guard to wait until the end of the probationary period. The Coast Guard, under its regulations, may discharge a member for failing to make reasonable and consistent progress toward the goal. And the commanding officer in this case made that judgment based upon the weight and body fat measurements that Mr. Chapman had been undergoing on a weekly basis on board the Mackinac. Was Mr. Chapman on notice that this could happen, that he would be checked periodically throughout, and that failure to make adequate progress would be sufficient grounds for including him, that he didn't get the whole period of time, even though the period of time was specified? Yes, he was on notice. He received counseling throughout the probationary period. This was not the first time that he'd been on weight control probation, but with respect to that. He had met the criteria each time. Perhaps he would go into some kind of drastic fast for the last month. There was no way of knowing whether it would have gone up or not this time, was there? There was not. It is possible, perhaps, that he could have met the standard by the end of the probationary period. But the Coast Guard regulations permit the commanding officer to discharge a member for failing to make reasonable and consistent progress. He wasn't given weekly or monthly bars that he had to meet? At least it doesn't show in the record. Well, Your Honor, he was weighed and measured on a weekly basis. And so he had a continual update of his progress, as did his command. That wasn't my question. Well, Your Honor, there wasn't a specific midpoint goal. But it's apparent from the commanding officer's review of the file, as well as the board, that they interpreted reasonable and consistent progress to mean a steady loss of either weight or body fat or both. And that it was apparent from the weekly measurements that he was not going to, that he was not making reasonable and consistent progress. And his weight was fluctuating. And his body fat was going up and down. But by the midpoint, he had not lost sufficient weight. By the midpoint, he had lost only 9 of the 70 pounds that he was required to lose. And he had lost only 1% of the 8% of body fat he was required to lose. I'm not meaning to correct you on the facts. And certainly, we don't review facts. But didn't he start this process at 259 pounds? And on August 1st, he was weighed in at 254? That's correct, Your Honor. So 5 pounds, not 9. Well, I guess I was reading the August 10th measurement. Oh, I see. Is that a different mid? I thought the August 1st was the midpoint. Maybe I'm wrong. The August, well, if we go by the August 1st as the midpoint, he was measured at 250 pounds at that point. And his body fat was 30%. 254. Right, which was 3% lower than he had started, but still 5% short of his goal, which was. But why is his body fat, he was supposed to lose 8% body fat during this period of time. At the midpoint, he had lost 3% body fat. Pretty close to half of what he was supposed to lose. He had to lose 8%. He had lost 3% at the midpoint. Well, Your Honor. So it's awfully unfair to cut him off there. Well, two considerations. First is that his weight was well short of the goal weight. And now it is true that he can meet the standard by either complying with the body fat or the weight standard. But the other point is that over the course of the weekly measurements and weekly weighing, there was fluctuation, 1% to 2% in either direction. In fact, his body fat actually went up by June 20th by 1% from his starting point. And so based upon a review of the weekly measurements, the commanding officer correctly determined that he was not on a path that would lead him toward compliance by the end of the probationary period. And as long as he was not making reasonable and consistent progress, the regulations permit a discharge on that basis. Is it improper for us to look behind whether he was making reasonable and consistent progress? Or is that one of those things beyond the scope of our review? That is a question of fact, Your Honor. And it's not beyond the court's review. But it's something that the court would have to draw a different conclusion based upon the fact. It's not beyond our review? We can? If it's a more stringent legal standard than the standard the court would apply toward the board's decision. But presumably, it could reach a different conclusion. How long had this been going on for? Most to most of 10 years? I would say yes, Your Honor. He was diagnosed in 95 and discharged in 05? That's correct, Your Honor. He was diagnosed in 1995 with what was called compulsive overeating at that time. And that was based upon a questionnaire that he had filled out and answered a series of questions. When was he first put on probation? He's been put on probation multiple times. I think, I believe the first time was in, I don't know off the top of my head, Your Honor, when his very first weight probation period was. But he was on weight probation a total of eight times during the course of his Coast Guard career. Is it correct that he met every one of the weight loss deadlines that he had been presented with? Yes, he was able to achieve compliance every time. So how did they know he wouldn't achieve compliance this time? Well, again, it was based upon the commanding officer's judgment after looking at the weekly measurements and looking at the progress he made. But he went back up again, right? He went back up again. The fact that he had to be put on it eight times meant that he couldn't stay under control. Your Honor, when he first reported to his command at the Mackinac, he was overweight at that point in time. And they didn't immediately put him on weight control probation. They put him, they gave him what they call in the board's opinion, a grace period. And then when he was measured in August in 2005 on board the Mackinac, he'd actually gained weight during that grace period. And that's when the commander decided to put him on the weight control probation. So it's a problem that he struggled with throughout his career. And he was able to manage to comply. But at this point in time, the commanding officer concluded, based on his weekly weigh-ins and his track record during his weigh-ins and measurements, that he was not going to make it. And more specifically, that he was not making reasonable and consistent progress. Well, you know, you can see what troubles me, that we are continually being confronted with rules and regulations and projects. And the judiciary tends to think that the agency that establishes these rules establishes them and will comply with them. And we should have a reason for intervening. But here, the agency established a period for weight loss and didn't wait to see whether that requirement would be met. Perhaps the Coast Guard thought it was unlikely. But how could they tell? Perhaps for all of the other events, there was a crisis period of metabolism or whatever. Perhaps Mr. Chapman knew he could comply if he acted in a certain way. Well, Your Honor, the critical point here is that the Coast Guard regulations do permit the Coast Guard to discharge a member for failing to make reasonable and consistent progress. Well, exactly. And therefore, they put him on a program with a deadline to see whether he would comply with the requirements. Right, and that program, there's in essence a dual requirement. There's a requirement that either the member complete the probationary period and achieve compliance by that point. But there's also a simultaneous requirement that the member show reasonable and consistent progress towards achieving that goal during the probationary period. Was that stated explicitly in the Coast Guard order that they put him on this program? Yes. Yes, it was. And he did receive counseling. So that he must make steady progress? Yes, Your Honor. And he did receive counseling both from his command and from his physician regarding the program. Is that order in the appendix? It is, Your Honor. Well, perhaps your colleague can find it. You may continue your argument. Well, if my colleague can help me find it, I will continue my argument. I'll give the court the precise citation to the appendix for that. OK, good. So please continue with your argument. Yes, Your Honor. I want to address the second question regarding whether the command referral forms that were filled out by the physicians meet the certification requirements set forth in the personnel manual. Both the board and the trial court concluded that they did. And first, the point I want to make is that there were three command referral forms that the Coast Guard filled out. One was filled out by a contract physician, Dr. Baltzar. But the other two were both filled out by uniformed Coast Guard doctors. And so the concern that the command referral forms didn't meet the certification requirement because they were not filled out by a uniformed Coast Guard officer should be discounted because two of the three were. And the command referral forms contain a statement that as to whether a certification, as to whether the member possesses an underlying medical condition for the member's excess weight. And in all three instances, the doctor said no, there was no underlying medical condition for the member's excess weight. The second question went to whether it was safe for the member to lose weight. What the court found was that these certification requirements did meet the certification requirements set forth in Article 12b12 of the Personnel Manual. And the command referral forms are the Coast Guard's implementation of the Personnel Manual requirement in Chapter 12b12. In other words, these forms are the mechanism by which the Coast Guard makes the certification that's a predicate to discharge for obesity. And so you mean they weren't just as good as, but they were the certifications? Yes, Your Honor. There is no separate form that contains the precise language that's set forth in Article 12b12. It is these forms, these command referral forms, that the Coast Guard regulations use to meet that requirement. And so for those reasons, we believe that both the trial court and the board was correct in concluding that the command referral forms and the certifications that were made upon those forms met the requirement that's a predicate for discharge for obesity in the Personnel Manual. Did your co-counsel find the document for you? Because if not, I think I did. Yes, I believe that he has. The one in particular is at 152 of the Joint Appendix. And it discusses the counseling that Mr. Chapman received. It's what's called a patient-centered appendix. And it says at the bottom, if you do not make reasonable and consistent progress toward attaining your maximum allowable body weight, you shall be processed for separation. And it goes further. It says. OK, that gives him a midpoint deadline. And he was separated at what point during the period? Right. And I didn't read the entire passage. It says in parens, lose approximately half of the required weight or half the excess body fat by the midpoint of the probationary period. But the separation was before the midpoint, is that right? That's no, Your Honor. He was processed for separation roughly at the midpoint. How roughly? Before or after? After, Your Honor. The midpoint, well, it's a little bit confusing because the probationary period originally started out to have ended by November 8th. But then it was subsequently enlarged to end by December 8th. And that had to do with the way they counted the weeks of the period. They first counted it as a series of four-week periods. And then they decided that, well, it really should be counted as calendar months. So how precisely can you say, this was the beginning of the period, this was the midpoint, and this was the end? Right. The beginning of the period was April 8th. The midpoint, as it was subsequently changed, was August 1st. And he was processed for discharge on August 10th. Or the process for discharging was initiated on August 10th. And what was the deadline? The final deadline was December 13th. He was discharged on September 27th, wasn't he? His ultimate discharge was final on September 27th. And the Coast Guard actually did ask that he, I think, at his request, receive a hydrostatic body fat measurement in September, which revealed his body fat was 37.7%, which is actually higher than the body fat he started the probationary period with. But the discharge was not based upon that hydrostatic measurement. The discharge was based upon his failure to make reasonable and consistent progress during the probationary period. And his discharge was initiated after the midpoint of that period. Thank you, Mr. Woodrow. For these reasons, I request that the court affirm the trial court's decision upholding the board's decision. Thank you, Mr. Woodrow. Mr. Timoney. Thank you, Your Honor. Just a couple of points. The contention that, since the court is addressing the issue, I want to follow up with, and the contention that he was not making reasonable and consistent progress is belied by the joint appendix at 173, 174, which I believe Judge Moore, perhaps, is referring to. And it shows the recordings on page 173 were all made by Claudia Simpson, who is the health specialist. There is a 20 June 03 recording, which was made by the executive officer who works for the command. And that's the one that departs up to 34%. And Mr. Chapman's contention was, of course, that that was the biased recording, that the others are consistent. More importantly, the recording of 1 August 2005 shows his weight at 254, percent body fat at 30. Over on page 174, which shows his required progress, as well as his actual progress, the court will note that his body fat was 30, and the required progress was 29.2, 0.8% that he was off the mark there. Hence, the suggestion and the claim of that his discharge was in reprisal for his communications critical of his command, because it's hard to otherwise explain the action that was taken. In terms of the council's contention that the command referral forms are the form used as the certification, that's incorrect. And that's demonstrated to be incorrect by the language of the board itself in its decision. The board stated, the board finds that although the language on the command referral form does not mirror the language in the personnel manual and conforms more closely to the language of Article 2E1 of the instruction, the purpose and meaning of the certification provided on the form is sufficient to meet the requirement of Article 12B12 of the personnel manual, which concerned the separation. That was certification, because the certifications indicate that the applicant had no underlying medical condition that caused his obesity, and the doctors had counseled him to lose the excess weight by diet and exercise. That's an interpretation of the regulation, statutory interpretation. And it's unreasonable, and it's not consistent with the plain language of the certification requirement one, because it needed to be done by a medical officer. And two, the scope is not the same as that required for separation. They're looking for any other cause, similar cause, organic or otherwise, for the individual's excess weight. Unless you have any questions with that, I'll stop. Thank you, Mr. Attorney. Thank you for your time and attention. Mr. Woodrow, the case is taken under submission.